DA 08-0397

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 395

JOHN DOE, M.D.,

      Plaintiff and Appellee,

  v.

COMMUNITY MEDICAL CENTER, INC.,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV-2008-269
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            John F. Sullivan, Cherche Prezeau, Hughes, Kellner, Sullivan
& Alke, PLLP, Helena, Montana

      For Appellee:

            Shane P. Coleman, Michael P. Manning, Holland & Hart, LLP,
Billings, Montana

Submitted on Briefs: July 22, 2009

Decided: November 24, 2009

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     The Community Medical Center (CMC) of Missoula, Montana, appeals the Fourth Judicial District Court's grant of injunctive relief in favor of Dr. Doe[1] and the court's denial of CMC's motion to dismiss.  We affirm and remand.

## ISSUE

¶2     We restate the issues presented on appeal as one issue:  Did the District Court manifestly abuse its discretion by granting Dr. Doe's motion for a preliminary injunction?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     This appeal involves CMC and a licensed physician, Dr. Doe, who, during 2007, applied for and obtained physician privileges with CMC as a hospitalist.  To obtain such privileges, Dr. Doe completed CMC's physician privilege application which contained a clause stating that if he was granted privileges he would adhere to CMC's Medical Staff Bylaws and Medical Staff Policies, one of which allowed an investigation if a physician acted in a manner "contrary to the ethical . . . mission of the medical profession."  Additionally, the Bylaws provided that if CMC issued an adverse recommendation pertaining to his clinical privileges, the doctor would exhaust "the intra organizational remedies" afforded by the Bylaws before resorting to formal legal action or asserting a claim against CMC.

---

[1] The plaintiff will be identified as Dr. Doe to preserve the confidentiality of a medical peer review proceeding.  His wife and children, who will also be referenced in this Opinion, will be identified as Ms. Doe and John and Jane.

¶4 During 2007 and 2008, Dr. Doe ordered numerous outpatient laboratory tests and imaging studies for himself, his wife, and their children. Both children had been diagnosed some months earlier with a rare, life-threatening medical condition involving panhypopituitarism or partial hypopituitarism. In late 2007, when CMC learned of the quantity and types of tests Dr. Doe ordered, it confronted Dr. Doe, expressing concern that such testing may constitute unethical medical treatment of family members. The chairperson of the Medical Executive Committee (MEC), Dr. Hiller, asked the Medical/Allied Health Staff Assistance Committee (MAHSAC or the Committee) to meet with Dr. Doe to investigate the matter. Prior to the meeting with MAHSAC, Dr. Doe consulted an attorney who suggested that the meeting would probably not be adversarial but if it was, Dr. Doe should not provide any information at that time.

¶5 At the meeting held on January 31, 2008, the Committee questioned Dr. Doe about outpatient medical records of Dr. Doe and his family. The Committee had obtained these personal medical records from both CMC and St. Patrick's Hospital without Dr. Doe's or his wife's permission. Additionally, at this meeting, the Committee asked Dr. Doe to disclose the names of all physicians treating each member of his family with regard to the lab tests he ordered, to authorize direct access to those physicians by Committee members, and to authorize access to all related medical records for his family. Dr. Doe was instructed to submit this information to the Medical Staff Coordinator by February 7, 2008.

¶6 At the conclusion of the January 31 meeting, Dr. Hiller, with the agreement of all members of the MAHSAC, summarily suspended Dr. Doe's privileges. She later stated

3

this was done because Dr. Doe's "demeanor and refusal or inability to coherently answer routine and legitimate questions regarding the volume and nature of the tests caused me to have serious and legitimate concerns regarding his mental health and ability to exercise good judgment." Dr. Doe later claimed that the Committee was accusatory, adversarial, and had violated his and his family's privacy rights by obtaining their medical records without consent. Dr. Doe did not submit the requested medical information on February 7; rather, he provided it later at a hearing on March 18, 2008. On February 21, 2008, the MEC upheld the suspension of Dr. Doe's privileges.

¶7 On February 27, 2008, Dr. Doe filed a complaint in the District Court alleging that CMC breached the terms of its contract with him as embodied in CMC's Bylaws and Policies by summarily suspending his privileges with no demonstration of "a substantial likelihood of imminent impairment of the health or safety of any patient, prospective patient, employee, or other person present in the Medical Center." (The foregoing appears to be the sole basis in the Bylaws for summary suspension.) Dr. Doe sought a declaratory judgment, a preliminary and permanent injunction, and a temporary restraining order (TRO). Dr. Doe petitioned the court to revoke the suspension of his privileges on the ground that it was issued in violation of CMC's Policies and Bylaws. He requested this action because such a revocation of the suspension and reinstatement of his privileges within 30 days would eliminate the requirement that CMC report his suspension to state and federal entities as required by state and federal law.

¶8 On February 28, 2008, the District Court held its first hearing in this matter at which both parties argued their respective positions on the TRO. Unbeknownst to the

4

court at the time the hearing began, CMC had filed its objection to Dr. Doe's TRO request and a motion to dismiss that morning. The court was informed of these filings during the hearing and both parties addressed the issues raised in these documents. At the conclusion of the hearing, the court instructed Dr. Doe and CMC to submit additional briefs and agreed to schedule a future hearing on these issues.

¶9 CMC's motion to dismiss Dr. Doe's complaint was not based on the ground that the complaint failed to state a claim for which relief could be granted but on the ground that the District Court did not have jurisdiction over Dr. Doe's complaint because Dr. Doe had not exhausted his "administrative remedies," i.e., those internal hospital remedies provided in the Bylaws. CMC argued that the "exhaustion doctrine" applies to private contracts such as the contracts executed between Dr. Doe and CMC. Relying on several extra-jurisdictional cases, CMC maintained that exhaustion of internal peer review remedies available to aggrieved physicians under a hospital's bylaws is required before the parties may seek judicial review. It asserted that this policy is founded on the recognition of the "special expertise of physician peer review, promoting the legislative objectives of [the Hospital Care Quality Improvement Act of 1986 (HCQIA)],[2] enhancing judicial review and promoting judicial economy." CMC argued that this policy applies

---

[2] "In 1986, Congress passed the HCQIA [42 U.S.C. §§ 11011-11152] to facilitate the effective peer review of physicians. Among its purposes, the HCQIA seeks to prevent incompetent physicians from relocating without disclosure of their previous records. The HCQIA requires health care entities to report to the state Board of Medical Examiners and the National Practitioner Data Bank any professional review actions that adversely affect a physician's clinical privileges for longer than thirty days, the physician's name, the reason for the action, and other relevant information. That information is then made available to other health-care entities upon request if the physician applies for clinical privileges or appointment to a medical staff." *Omar v. Jewish Hosp. Healthcare Services*, 153 S.W.3d 845, 847 (Ky. App. 2004).

whether the physician's legal theory is grounded in contract or tort or the doctor is seeking equitable or legal relief. CMC also opined that any alleged failure on its part to follow its own procedures and policies is not a defense to the exhaustion requirement. CMC asserts a similar argument on appeal.

¶10 Dr. Doe countered before the District Court and to this Court on appeal that exhaustion of the Hospital's administrative remedies is unnecessary in this case because (1) Montana law allows a private party to seek declaratory judgment and injunctions against another private party without first exhausting his or her administrative remedies; (2) exhaustion of internal hospital remedies in this case would be "useless" because the internal review process did not provide a mechanism for enjoining the reporting obligation during the internal appeals process, and therefore by the time exhaustion occurred, CMC would have already reported the suspension to state and federal entities; and (3) because CMC breached its Bylaws and Policies in the manner in which it suspended him, exhaustion of administrative remedies as required by those Bylaws and Policies is not required.

¶11 The court held a hearing on March 18, 2008, to address both Dr. Doe's petition for a TRO and CMC's motion to dismiss. It heard witness testimony and admitted numerous exhibits.[3] On March 25, 2008, the District Court granted Dr. Doe's application for a

___

[3] As we have explained before, "a district court 'has the discretion to include or exclude matters presented to it that are outside of the pleadings when considering a motion to dismiss,' although, if choosing to look beyond the pleadings, it must generally treat the motion as one for summary judgment under Rule 56, M. R. Civ. P., and give notice of this intention to the parties." *Lozeau v. GEICO Indem. Co.*, 2009 MT 136, ¶ 10, 350 Mont. 320, 207 P.3d 316 (internal citations omitted). While the District Court does not appear to have given the parties express notice of

6

TRO. As a result of the TRO, CMC was prohibited from notifying the National Practitioner Data Bank[4] and the Montana Board of Medical Examiners (MBME or the Board) of Dr. Doe's suspension as required by 42 U.S.C. § 11133(a)(1)(A) of the HCQIA, and § 37-3-403, MCA. Under the terms of the TRO, Dr. Doe agreed to refrain from practicing medicine at CMC or any other facility until the District Court conducted a preliminary injunction hearing and issued a further ruling.

¶12 Following a May 12, 2008 preliminary injunction hearing, the court issued an order amending the TRO. In the amended order, Dr. Doe was authorized to practice medicine at other facilities but continued to be restrained from practicing at CMC. CMC moved for reconsideration of the amended TRO and the District Court denied the motion. On July 30, 2008, the District Court granted Dr. Doe's motion for a preliminary injunction and denied CMC's motion to dismiss Dr. Doe's complaint.

¶13 CMC appeals the District Court's denial of its motion to dismiss and the issuance of the court's injunction.

**STANDARD OF REVIEW**

¶14 District courts are vested with substantial discretion to maintain the status quo through injunctive relief. Accordingly, we refuse to disturb a district court's decision to

---

this conversion, it nonetheless gave them ample opportunity to present evidence and neither party was surprised by the other parties' evidence. *Lozeau,* ¶ 11. Additionally, the parties acknowledge that the court converted CMC's motion to dismiss to a motion for summary judgment.

[4] The National Practitioner Data Bank (NPDB) is a national repository for notices of all malpractice settlements, adverse actions against hospital privileges and state licensure actions against physicians. A facility that suspends a physician's privileges for a period of thirty days or more must report the suspension to the NPDB.

grant or deny a preliminary injunction unless a manifest abuse of discretion has been shown. A manifest abuse of discretion is "one that is obvious, evident or unmistakable." Where the district court issues an injunction based on conclusions of law, we review those conclusions for correctness. *Cole v. St. James Healthcare*, 2008 MT 453, ¶ 9, 348 Mont. 68, 199 P.3d 810 (internal citations omitted).

¶15 Where a motion to dismiss is converted by the district court into a motion for summary judgment by the court's consideration of matters beyond the pleadings, the same standard of review applied to an appeal from a grant or denial of summary judgment is used. We review a district court's denial of summary judgment de novo— applying the same criteria as the district court pursuant to M. R. Civ. P. 56(c). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c); *Polzin v. Appleway Equipment Leasing, Inc.*, 2008 MT 300, ¶ 9, 345 Mont. 508, 191 P.3d 476 (internal citations omitted).

## DISCUSSION

¶16 *Did the District Court manifestly abuse its discretion by granting Dr. Doe's motion for a preliminary injunction?*

¶17 As indicated above, the District Court entered four orders in this case—the TRO, the amended TRO, an order denying reconsideration of the amended TRO, and the preliminary injunction. The court set forth its factual findings in the original TRO and incorporated those findings into its preliminary injunction order. Among others findings, the court found that:

8

(1) CMC's Bylaws and Policies constituted a contract between Dr. Doe and CMC;

(2) the function of the MEC and the MAHSAC is to handle extreme aberrations of behavior, including drug and alcohol abuse;

(3) Dr. Doe had no history of such behaviors and none were established prior to his suspension;

(4) the circumstances of this case supported equitable relief;

(5) CMC is obligated under federal law to report Dr. Doe's suspension within thirty days of the suspension;

(6) CMC did not identify a specific behavior issue other than Dr. Doe's refusal to provide private medical information regarding his children and refusal to sign a blanket waiver of confidentiality with regard to his children's medical treatment;

(7) CMC received the requested information from Dr. Doe at the March 18 hearing;

(8) if CMC reported Dr. Doe's suspension to the NPDB as required by statute, Dr. Doe would suffer irreparable harm to his professional reputation and to his practice, career and livelihood;

(9) if Dr. Doe ceased to practice at CMC during the pendency of this proceeding, CMC would have the same level of protection and control that it sought with the summary suspension; and

(10) a TRO is appropriate to allow the parties to continue their attempts to compromise and resolve the matter.

¶18    The District Court then concluded that Dr. Doe was entitled to the TRO under § 27-19-201(1) and (2), MCA, i.e., because he had demonstrated a likelihood of success on the merits and a likelihood of irreparable harm if the mandatory reporting occurred. The court further held that Dr. Doe had established that the threat of harm to him outweighed any potential harm to CMC, and that the injunction was not adverse to public interest.

9

¶19 After the subsequent preliminary injunction hearing the District Court issued the requested injunction, concluding that Dr. Doe had met his burden under § 27-19-201, MCA. Bearing in mind that injunctive relief is not available when monetary damages will afford an adequate remedy, the court also concluded that Dr. Doe had met his burden under *Shammel v. Canyon Resources Corp.*, 2003 MT 372, ¶ 17, 319 Mont. 132, 82 P.3d 912. In *Shammel*, the Court set forth the following four-part test that a party petitioning for an injunction has the burden of proving: (1) the likelihood that the movant will succeed on the merits of the action; (2) the likelihood that the movant will suffer irreparable injury absent the issuance of a preliminary injunction; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party (a balancing of the equities); and (4) the injunction, if issued, would not be adverse to the public interest. Determining that Dr. Doe had satisfied the four-prong test, it decided that preserving the status quo until a trial on the merits of the claims was appropriate.

¶20 On appeal, CMC assigns numerous errors to the District Court's injunction order. Relying on *Diaz v. Provena Hospitals*, 817 N.E.2d 206 (Ill. App. 2 Dist. 2004), CMC submits that the District Court has no authority, under federal preemption law, to enter injunctive relief interfering with a hospital's federal mandatory reporting requirements. It also asserts, as referenced above, that Dr. Doe was required to complete the Hospital's peer review process before seeking judicial review in district court. CMC maintains that had Dr. Doe cooperated with the investigating committee in accordance with the Bylaws and Policies and not interrupted the administrative proceeding with the injunction

request, it was likely the matter could have been resolved before CMC was required to report the suspension under state and federal law.

¶21 CMC does not argue that the District Court did not properly analyze and apply § 27-19-201, MCA, to the case at bar. Rather, it argues that under § 27-19-103(4), MCA, an injunction cannot be granted "to prevent the execution of a public statute by officers of the law for the public benefit." It asserts that, according to *Garrow v. Elizabeth General Hospital, Etc.*, 401 A.2d 533 (N.J. 1979), CMC, as a Montana public benefit nonprofit corporation, meets the meaning of the term "officers of the law." Additionally, it claims that the MBME is the "officer of the law" charged with the responsibility to administer and enforce the licensing and discipline statutes that regulate the practice of medicine in Montana.

¶22 Furthermore, CMC maintains that the District Court incorrectly concluded that Dr. Doe would be irreparably damaged by the type of reports that CMC was required to submit to the NPDB. Citing the NPDB Guidebook, CMC points out that if information submitted by a hospital is changed at a later time, the hospital must file a revision or a "void" report. It also argues that reporting Dr. Doe's suspension to the MBME would merely trigger an inquiry and investigation by the Board. CMC further asserts that the injunction is adverse to the public interest because the court may have jeopardized members of the public by authorizing Dr. Doe to practice at facilities other than CMC before Dr. Doe's fitness to practice had been resolved, and thereby elevated Dr. Doe's interests over those of the public that the reporting statutes were enacted to protect.

¶23 Dr. Doe disputes the applicability of *Diaz*, arguing that this Court, in *Cole*, rejected the argument that a district court cannot enjoin a hospital's NPDB reporting requirements. He also counters that § 27-19-103(4), MCA, is not applicable as CMC is not an "officer of the law." He submits that § 27-19-201, MCA, unequivocally permits the District Court to issue an injunction under these circumstances; therefore, because the District Court had authority and jurisdiction to grant such relief, we need only decide if the District Court manifestly abused its discretion by doing so. He asserts that the District Court did not abuse its discretion at all, much less manifestly.

¶24 First, we address the parties' reliance on *Diaz* and *Cole*. In *Diaz*, Provena Hospital summarily suspended Dr. Diaz's hospital privileges on multiple grounds, and later permanently revoked her privileges. Dr. Diaz filed a complaint in circuit court asking the court to declare Provena's decision to suspend her to be in violation of applicable Hospital Acts and Bylaws. She also sought an injunction and a TRO. The court issued the TRO, which restored her privileges and precluded Provena from reporting her suspension to the NPDB. *Diaz*, 817 N.E.2d at 209. Subsequently, Dr. Diaz allowed her privileges to lapse. As a result of this voluntary surrender of her privileges, Provena, in accordance with the federal reporting requirements, reported Diaz's surrender to NPDB. In its notice to NPDB, however, it revealed the prior summary suspension and revocation, the filing and status of the circuit court proceeding, and the imposition of the TRO. *Diaz*, 817 N.E.2d at 210. Diaz filed a petition for show cause, arguing Provena had violated the TRO. The circuit court agreed and ordered Provena to submit a "void" report to NPDB. Provena refused and the court held it in contempt. *Diaz*, 817 N.E.2d at

12

210. Provena appealed the contempt order and moved for a stay. The Illinois Appellate Court granted the stay. *Diaz*, 817 N.E.2d at 210-11.

¶25 The appeals court concluded that the HCQIA requiring hospitals to report to the NPDB certain actions pertaining to physicians preempted Illinois law and the trial court's orders. The court stated that federal decisions interpreting the HCQIA were binding on Illinois courts. While citing only one federal decision which states that courts should defer to the U. S. Department of Health and Human Services' interpretation of the NPDB Guidebook for determining questions of "privilege surrender" and "under investigation," the court, without further case authority, concluded that Dr. Diaz's voluntary surrender of her privileges while she was under investigation triggered Provena's obligation to submit a report to NPDB. *Diaz*, 817 N.E.2d at 211. The appeals court ruled that under the supremacy clause of the U. S. Constitution, the federal HCQIA impliedly preempted the court's orders to Provena. The court held that "[b]ecause it was impossible for [Provena] to comply with the HCQIA without being fined and held in contempt of court, the doctrine of implied preemption applies." *Diaz*, 817 N.E.2d at 213. The court also held "that the trial court's orders requiring [Provena] to submit a void report would impede the accomplishment of Congress's objectives in enacting the HCQIA." *Diaz*, 817 N.E.2d at 213.

¶26 In contrast to *Diaz* is our decision in *Cole*. In *Cole*, St. James Healthcare changed Dr. Cole's status from "active" to "consulting" without any advance notice. It then denied his request to internally appeal this decision. St. James explained in a letter to Dr. Cole that it had "serious concerns regarding [Dr. Cole's] professional relationship with

other healthcare providers, staff and patients." *Cole*, ¶ 5. In response to Dr. Cole's request for reappointment, St. James informed him that it needed more information, and hired an attorney to conduct an investigation. Dr. Cole refused to cooperate, believing that he was entitled to an investigation conducted by his peers on the medical staff. St. James issued a preliminary decision denying Dr. Cole's reappointment. *Cole*, ¶ 6. Dr. Cole initially sought appeal of the decision through the administrative process but before the hearing was conducted, he filed a complaint against St. James in district court, and sought a preliminary injunction prohibiting St. James from taking any further adverse action against him. *Cole*, ¶ 7. The district court granted Dr. Cole's motion for a preliminary injunction. As a result, among other things, St. James was enjoined from reporting Dr. Cole's status change to the NPDB. *Cole*, ¶ 8.

¶27 The district court in *Cole* concluded that Dr. Cole's application for an injunction met the requirements of § 27-19-201(1), (2), and (3), MCA. *Cole*, ¶ 14. We analyzed the case looking exclusively at § 27-19-201(1), MCA, and concluded that Dr. Cole's application established the likelihood that he would prevail on the merits, and therefore no further analysis was required. We affirmed the district court, holding that St. James failed to demonstrate that the district court manifestly abused its discretion and that the court had correctly concluded Dr. Cole's application for a preliminary injunction satisfied § 27-19-201(1), MCA. *Cole*, ¶ 27.

¶28 It does not appear that St. James argued in *Cole* that the district court lacked authority to issue injunctive relief because the supremacy clause elevated the HCQIA over state law; therefore, this Court did not address this. As a result, *Cole* stands for the

14

proposition that a district court may grant a preliminary injunction against a healthcare facility, precluding the facility from submitting mandatory reports to the NPDB, if the petitioner satisfies at least one subsection of § 27-19-201, MCA.

¶29 While the Illinois Appellate Court reached a "preemption" conclusion in *Diaz* under facts somewhat similar to those before us, we decline to follow. Nor does CMC present a specific legal argument urging us to do so. Moreover, because we have not been presented with evidence of an express declaration in the HCQIA of its intent to preempt state law, we continue to embrace a "presumption against preemption" in those instances in which Congress legislates in a field which the states traditionally have occupied, such as physician regulation. *Fenno v. Mountain West Bank*, 2008 MT 267, ¶ 12, 345 Mont. 161, 192 P.3d 224.

¶30 The presumption against preemption is especially strong in cases in which Congress has arguably preempted state common law remedies but has failed to create a federal cause of action or some administrative remedy to replace the preempted state remedy. *Sleath v. West Mont Home Health Services*, 2000 MT 381, ¶ 63, 304 Mont. 1, 16 P.3d 1042. Such would be the situation here. If we were to conclude that HCQIA, which does not provide a federal injunctive remedy, preempted or displaced state common-law remedies, then Dr. Doe would be powerless to prevent the hospital from reporting him to NPDB and MBME before the merits of his breach of contract claim could be aired in a court of law. We decline to endorse such a scenario. For these reasons, we are guided in this case by *Cole*.

15

¶31 Next, we address CMC's "exhaustion of administrative remedies" argument. The peer review process here was triggered once the Hospital summarily suspended Dr. Doe for conduct requiring "immediate action to . . . reduce a substantial likelihood of imminent impairment of the health or safety of any patient, prospective patients, employee or other person present in the Medical Center." The very crux of Dr. Doe's complaint in District Court was the complete absence of any evidence or even suggestion by the MEC that Dr. Doe's conduct had placed the health or safety of any patient or other person in the Medical Center in jeopardy; therefore, he alleges, there were no facts justifying nor was there a legal basis for summarily suspending his privileges. This being so, the suspension and ensuing proposed peer review were outside the parameters of the Bylaws, and as such constituted a breach of the contract between the Hospital and Dr. Doe. Dr. Doe sought to establish this breach of contract in district court, and prevent the Hospital from ruining his reputation as a physician before he could vindicate his contractual right to be free from unwarranted peer review.

¶32 Notwithstanding the validity and propriety of peer review as a process whereby the conduct of a physician that endangers patients or other persons within the Medical Center can be immediately reviewed by his peers, we cannot preclude a physician from seeking access to the courts to remedy an ostensible breach of contract, especially where, as here, nothing in the contract would prevent either party from suing for breach of contract in a court of law.

¶33 The District Court did not address the "exhaustion of administrative remedies" argument raised by CMC; rather, the court concluded that based upon the breach of

contract allegations, upon which the court concluded that Dr. Doe had a likelihood of success, the case was suitable for consideration of injunctive relief. Because the breach of contract cause of action is not subject to the exhaustion of administrative remedies clause in the Bylaws, we conclude that it was not error for the District Court to decline to address this argument.

¶34     Next, we reject CMC's argument that § 27-19-103(4), MCA, precludes the District Court from issuing a preliminary injunction in this case. While CMC cites to *Garrow* for authority that CMC is an "officer of the law," we are not persuaded. *Garrow* states that a "non-profit private hospital serving the public generally is a quasi-public institution whose obligation to serve the public is the linchpin of its public trust and the fiduciary relationship which arises out of the management of that trust." *Garrow*, 401 A.2d at 537. We do not disagree with this general statement but conclude that it does not follow that a "quasi-public institution" is an "officer of the law" for purposes of § 27-19-103(4), MCA. Moreover, the MBME, whether an "officer of the law" or not, is not a party to this case and by CMC's own acknowledgment, notification to MBME would merely trigger an inquiry and investigation, both of which can occur if Dr. Doe fails to prevail on his claim in District Court and the injunction is lifted. As § 27-19-103(4), MCA, does not preclude the issuance of an injunction in this case, we turn to § 27-19-201, MCA.

¶35     Section 27-19-201, MCA, provides that a district court may issue a preliminary injunction under certain circumstances. Subsections (1) and (2) apply to the case before us:

17

(1) when it appears that the applicant is entitled to the relief demanded and the relief or any part of the relief consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually; [or]

(2) when it appears that the commission or continuance of some act during the litigation would produce a great or irreparable injury to the applicant.

Section 27-19-201(1) and (2), MCA. The statute in its entirety contains five factors that the court may consider when faced with an injunction request. Noting that this statute is written in the disjunctive, we have held that the moving party must satisfy only one of the factors in order to prevail. *Cole*, ¶ 14. In this case, the court determined that Dr. Doe had met the two factors listed above.

¶36 As we stated in *Cole*, it is neither the District Court's province, nor this Court's, to decide the merits of the case at this juncture. *Cole*, ¶ 13. *See also City of Whitefish v. Bd. of County Com'rs*, 2008 MT 436, 347 Mont. 490, 199 P.3d 201. Here, the District Court, without determining whether CMC had breached its contract with Dr. Doe but relying on witness testimony and the parties' briefs, concluded that Dr. Doe had demonstrated a likelihood of success on the merits. This conclusion is supported by the District Court's finding that CMC did not identify a specific behavior issue other than Dr. Doe's refusal to provide private medical information regarding his children and his refusal to sign a blanket waiver of confidentiality with regard to his children's medical treatment. Moreover, the District Court heard credible testimony that Dr. Doe is "an excellent physician" who exhibited no behavior that would suggest that he was "incapable, incompetent, or not qualified to practice as a hospitalist at CMC." CMC's Bylaws authorized summary suspension upon a demonstration of a substantial likelihood of

imminent impairment of the health or safety of a patient, a prospective patient, an employee, or other person present at CMC. Absent such a demonstration, we will not disturb the District Court's preliminary determination in this regard.

¶37 Turning to the court's conclusion that it was also authorized to grant Dr. Doe's preliminary injunction request under § 27-19-201(2), MCA, we agree that Dr. Doe has demonstrated a likelihood of irreparable harm if CMC is allowed to report his suspension prior to the resolution of the underlying merits of this case. While CMC asserts that these reports, because they can be "voided" later if appropriate or necessary, would not harm Dr. Doe or his reputation, the fact is that a ringing bell cannot be unrung. An erroneous report announcing to all interested parties that a physician is being investigated or suspended for unethical activity or impairment has the potential for immediate harm as well as permanent harm, even if later retracted.

¶38 Lastly, we do not conclude that the District Court elevated Dr. Doe's interests over those of the public. As noted above, there was no evidence presented that Dr. Doe was a danger to patients or staff at any hospital in which he is privileged to practice. There was, however, a danger that Dr. Doe's professional reputation and his livelihood could be seriously damaged by the reporting of his suspension under these circumstances.

¶39 We conclude that CMC has failed to demonstrate that the District Court manifestly abused its discretion by issuing the preliminary injunction. The District Court correctly concluded that Dr. Doe's application satisfied the requirements of § 27-19-201(1) and (2), MCA. Therefore, the Hospital is enjoined from filing reports required by the HCQIA until this case has been tried and resolved. If CMC prevails, it can report the suspension.

¶40   Finally, we address the District Court's denial of CMC's motion to dismiss. The District Court did not specifically address in its TRO and injunction orders the arguments CMC raised in its motion to dismiss. It found, as noted above, that the allegations set forth in Dr. Doe's complaint that CMC breached the contract supported the grant of equitable relief. It concluded as well that the allegations in the complaint demonstrated a likelihood that Dr. Doe would succeed on the merits of his claims, a likelihood that he would suffer irreparable harm if the injunction was not granted, that this threat of harm outweighed any potential harm to CMC, and that the injunction was not adverse to the public interest. Having concluded that the requirements for an injunction were satisfied, the District Court, having converted CMC's motion to dismiss to a motion for summary judgment, denied the motion without further explanation.

¶41   As we have frequently stated, summary judgment is an extreme remedy because it is a ruling on the merits of a case which terminates a complainant's district court proceedings with prejudice. Conversely, dismissal of a complaint for failure to state of claim upon which relief may be granted is not a "terminal" ruling on the merits; rather, the complainant may recast his or her complaint and file it again, providing it is done within the required period of limitations. *Meagher v. Butte-Silver Bow City-County*, 2007 MT 129, ¶ 17, 337 Mont. 339, 160 P.3d 552.

¶42   Upon the court's ruling that Dr. Doe was entitled to a preliminary injunction having demonstrated a likelihood of prevailing on the merits of his claim as set forth in his complaint, we conclude the District Court did not err in denying CMC's motion.

**CONCLUSION**

20

¶43 For the foregoing reasons, we affirm the District Court's denial of CMC's motion to dismiss and its granting of Dr. Doe's application for a preliminary injunction. We remand the matter for resolution of the issues before the court.

/S/ PATRICIA O. COTTER

We concur:

/S/ MIKE McGRATH
/S/ JOHN WARNER
/S/ JAMES C. NELSON

Justice James C. Nelson concurs.

¶44 I concur in the Court's decision. Besides the rationale set forth in the Court's Opinion, I am also persuaded that the propriety of the tests ordered by Dr. Doe for his family was not a matter which was properly within the purview of the Assistance Committee.

¶45 In this regard, MEC and its amici argue at length about the importance and the sanctity of the "peer review" process. I do not disagree that this process serves important quality assurance, patient care and educational purposes. However, under Community Medical Center, Inc. Medical Staff Policy MSP-030, the peer review process is conducted by certain designated medical staff departments and committees, not by the Assistance Committee. Indeed, MSP-050 specifically requires that "[a]ll matters regarding quality of care will be referred to the appropriate Department." This process was not followed here.

¶46 If, as MEC and its amici contend, the "peer review" process is sacrosanct, then MEC should simply have used that process, rather than the one it did. Despite the arguments on brief of MEC and its amici, our decision here does no violence to the "peer review" process.

¶47 I concur.

/S/ JAMES C. NELSON

Justice Jim Rice, dissenting.

¶48 This decision places the professional reputation of a doctor, suspended for violations of medical ethics, over the health, safety and welfare of his patients and of the public. The District Court's issuance of an injunction preventing CMC from performing its express legal duty to report its investigative suspension of Dr. Doe to the national and state boards of medical examiners has eviscerated the careful process provided and required by 42 U.S.C. § 11101, et seq. and § 37-3-403, MCA (2007). Because Congress enacted procedural safeguards under the Health Care Quality Improvement Act of 1986 (HCQIA), which permit physicians to challenge such mandatory reports, state injunctive remedies have been preempted. Even if federal preemption had not occurred, the District Court manifestly abused its discretion in issuing the injunction under state law.

¶49 Congress enacted the HCQIA to improve the quality of health care by "identify[ing] and disciplin[ing] those who engage in unprofessional behavior." U.S. Department of Health and Human Services, *National Practitioner Data Bank Guidebook*

22

A-2 (Sept. 2001) (available at http://www.npdb-hipdb.hrsa.gov/pubs/gb/NPDB_ Guidebook.pdf) (hereinafter NPDB Guidebook); *see* 42 U.S.C. § 11101, et seq. Congress established the National Practitioner Data Bank (NPDB) "to address the problems that can result when doctors who are identified by their peers as being incompetent or unprofessional are able to move and continue their [medical] careers without anyone being aware of their previous incompetence or unprofessional actions." *Simpkins v. Shalala*, 999 F. Supp. 106, 110 (D.D.C. 1998) (citing 42 U.S.C. § 11101(1) and (2)). Under the HCQIA, a hospital that suspends a physician for more than 30 days must report that suspension to the national Board of Medical Examiners and the NPDB. 42 U.S.C. § 11133(a)(1)(A); 45 C.F.R. § 60.9(a)(1)(i). The NPDB is an "alert," or "flagging system." The information is intended to "direct discrete inquiry into and scrutiny of specific areas of a practitioner's licensure [and] record of clinical privileges." NPDB Guidebook, A-3. "The NPDB is intended to augment, not replace, traditional forms of credentials review," and as such is yet "another resource to assist State licensing boards, hospitals, and other health care entities in conducting extensive, independent investigations of the qualifications of the health care practitioners they seek to license or hire, or to whom they wish to grant clinical privileges." NPDB Guidebook, A-3.

¶50    These provisions make clear that "[t]he information in the NPDB should serve *only* to alert State licensing authorities and health care entities that there *may* be a problem with a particular practitioner's professional competence or conduct." NPDB Guidebook, A-3 (emphasis added). The information reported to the NPDB is confidential, and disclosed only to appropriate agencies or persons. 45 C.F.R. § 60.13;

23

NPDB Guidebook, A-3. Contrary to the Court's previous analogy of a report being a "scarlet letter" on the doctor's record, *Cole*, ¶ 23, the confidential report serves only to alert other hospitals and medical facilities of the pending investigative proceedings and disciplinary actions. Carefully, Congress specifically identified the suspension or disciplinary proceedings which require a report to the NPDB, while likewise identifying those proceedings which are not to be reported. 45 C.F.R. § 60.3(a)-(d); NPDB Guidebook, Chapter E Reports.

¶51 Critically, in addition to establishing reporting requirements, the HCQIA regulations also establish an administrative remedial proceeding whereby a reported physician "may dispute the accuracy of information in the Data Bank concerning himself or herself." 45 C.F.R. § 60.14(a); *Brown v. Med. College of Ohio*, 79 F. Supp. 2d 840, 844 (1999). "When a physician initiates such a dispute, a 'dispute notation' is added to the report, and any hospital requesting information about a reported physician is informed that the report is in dispute." *Brown*, 79 F. Supp. 2d at 844 (citing NPDB, *Fact Sheet on the Dispute Process*, (available at http://www.npdb-hipdb.hrsa.gov/pubs/fs/Fact_Sheet-Dispute_Process.pdf) (hereinafter NPDB Fact Sheet)); NPDB Guidebook, Chapter F Disputes.

¶52 Throughout this dispute proceeding, the physician is provided a panoply of due process rights, starting with adequate notice and specific hearing requirements. 42 U.S.C. § 11112(a)-(c); *see* NPDB Guidebook, Chapters E Reports, F Disputes. The hearing must be conducted by a mutually acceptable arbitrator, hearing officer, or panel of individuals appointed by the entity and not in direct economic competition with the

physician involved. 42 U.S.C. § 11112(b)(3)(A)(i)-(iii). At the hearing, the physician possesses numerous rights by statute, including the right to be represented by an attorney or other person of the physician's choice; to have a record made; to call, examine, and cross-examine witnesses; to present evidence; and to submit written statements. 42 U.S.C. § 11112(b)(3)(C)(i)-(D)(ii).

¶53 The reporting agency is also required to report a "reversal of a professional review action or reinstatement of a license." 45 C.F.R. §§ 60.6(b) and 60.9; NPDB Guidebook, E-5–7; NPDB Fact Sheet. Thus, if the physician prevails, and the suspension is reversed or modified, the reporting agency must file an additional report to void, remove or revise the original report. NPDB Guidebook, E-5–7.

¶54 The Court reasons that the HCQIA does not preempt state law remedies because it "does not provide a federal injunctive remedy." Opinion, ¶ 30. In the Court's view, because Dr. Doe could not federally enjoin CMC from reporting to the NPDB and the MBME prior to resolution of his case on the merits, there can be no preemption. Opinion, ¶ 30.

¶55 I believe this holding is incorrect, both legally and practically. Of paramount importance to Congress was protecting the public by bringing to light physicians even *suspected* of medical ethics violations. In the categories designated, Congress wanted an initial report in all cases, and thus, there is no "federal injunctive remedy" under the HCQIA. Instead, Congress provided an administrative procedure by which a physician can designate a report as "disputed" and challenge the validity of the report. Thereafter, reports found to be without merit must be retracted or corrected.

¶56     In *Diaz v. Provena Hosps.*, 817 N.E.2d 206, 212-13 (Ill. App. 2 Dist. 2004), the Appellate Court of Illinois concluded that the HCQIA preempted entry of an order enjoining reporting. The court recognized that federal law impliedly preempts state law if (1) a state common-law claim directly conflicts with federal law, (2) it is impossible to comply with federal law without incurring liability under state common law, or (3) "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Diaz*, 817 N.E.2d at 212-13 (quoting *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65, 123 S. Ct. 518, 527 (2002); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S. Ct. 1483, 1487 (1995)); *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604-05, 111 S. Ct. 2476, 2481-82 (1991).[1] In *Diaz*, the trial court's injunction had placed the Hospital in an irreconcilable position: it was required to report Dr. Diaz to the NPDB under federal law, yet would be fined and held in contempt if it disobeyed the state court's injunction against reporting. The *Diaz* Court also concluded that the trial court's injunction impeded the accomplishment of Congress's objectives under the HCQIA, which are "intended to protect patients, not doctors." *Diaz*, 817 N.E.2d at 212-13; *see also Taylor v. Kennestone Hosp., Inc.*, 596 S.E.2d 179, 186-87, and n. 4 (Ga. App. 2004) (HCQIA only preempts that state law to the extent the federal and state laws conflict).

---

[1] Even when Congress has not chosen to occupy a particular field, preemption may occur to the extent that state and federal law actually conflict. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 1217 (1963), or when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941).

¶57 Though stated somewhat differently, Montana's preemption law essentially mirrors these concepts. Federal law can preempt state law in three ways: (1) Congress expressly provides that state law will not apply in the area governed by the federal statutes; (2) the state law actually conflicts with the federal law (called "conflict preemption"), which occurs when "one cannot comply with both state and federal law, or when 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress;'" or (3) Congress impliedly preempts state law "where the regulation of the area is so comprehensive that it is reasonable to conclude that Congress intended to 'occupy the field' and to leave no room for supplementary state regulation." *Fenno v. Mountain West Bank*, 2008 MT 267, ¶ 11, 345 Mont. 161, 192 P.3d 224 (citing *Vitullo v. Intl. Bhd. of Elec. Workers, Loc. 206*, 2003 MT 219, ¶ 14, 317 Mont. 142, 75 P.3d 1250; *Favel v. Am. Renovation and Constr. Co.*, 2002 MT 266, ¶ 40, 312 Mont. 285, 59 P.3d 412).

¶58 The District Court's order here has placed CMC in the same irreconcilable position as the Hospital in *Diaz*. It faces the same Hobson's choice: report Dr. Doe as required under federal law and face contempt for violating the state court injunction, or comply with the District Court's injunction and violate federal law. This is what our cases have described as "conflict preemption." *Fenno*, ¶ 11 (citations omitted). Further, enjoining the reporting contravenes the express purpose of the HCQIA, and thus establishes implied preemption. "Congress has determined that it is important for these entities to have access to data . . . *while investigations are pending*, in order to protect the health and safety of patients by preventing incompetent physicians from continuing to

practice without any record of past problems." *Diaz*, 817 N.E.2d at 213 (emphasis added). Congress established a comprehensive regulatory scheme to accomplish these goals, and enjoining CMC from reporting obviates this purpose, keeping other hospitals, physicians, and the public ignorant of Dr. Doe's suspension at CMC. As the *Diaz* Court recognized, by failing to notify the proper authorities about Dr. Doe, "the trial court directly thwarts Congress's objectives in enacting the HCQIA." *Diaz*, 817 N.E.2d at 213. And, as recognized in a recent federal district court decision, a physician's request for an injunction against reporting is inappropriate prior to exhaustion of the HCQIA administrative process. *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 609 F. Supp. 2d 1163, 1178 (D. Nev. 2009). I disagree with the Court that the decision in *Cole* stands for the proposition that a hospital's federal reporting requirements can be enjoined. Opinion, ¶ 28. Federal preemption was not raised in *Cole*.

¶59 Even assuming *arguendo* that there was not federal preemption, the District Court manifestly abused its discretion in its application of § 27-19-201, MCA, and the *Shammel* factors. Given the intent, purpose and administrative process under the HCQIA, there is no irreparable danger to Dr. Doe's professional reputation. *See Giannoukos v. Harp*, 369 F. Supp. 2d 715, 719 (E.D. Va. 2005) (harm to the physician's reputation is "mere speculation"). As detailed above, Congress wanted reporting even in suspected cases of medical ethics violations, and provided administrative remedies for erroneous reporting to protect a physician's reputation. Although the Court offers that "a ringing bell cannot be unrung," Opinion, ¶ 37, Congress has ordered the bell rung.

28

¶60 The real danger here is not the possible harm to Dr. Doe's reputation, but to the public. At stake are the safety and welfare of anyone under that physician's care. If the report later proves unfounded, the report will be retracted. However, if the report proves true, those under that physician's care would have been protected during the process. Without such supervision and oversight, patients' lives may unnecessarily be placed in jeopardy.

¶61 By preventing reporting, the Court disregards our long-held tenets that we will not interpret statutes to defeat their obvious purposes, and that we must be cognizant of what the legislature intended. *Murphy for L.C. v. State*, 229 Mont. 342, 346, 748 P.2d 907, 909 (1987) (citing *Mont. Wildlife Fedn. v. Sager*, 190 Mont. 247, 264, 620 P.2d 1189, 1199 (1980)). When dealing with protections for the public safety and welfare, it is for the legislature to decide what regulations are needed. *Sager*, 190 Mont. at 261, 620 P.2d at 1198 (citations omitted). Affirming the injunction which prevents CMC from reporting under 42 U.S.C. § 11101, et seq. and § 37-3-403, MCA, not only effectively eviscerates the federal and state statutes, but creates a precedent under which the potential harm to the physician's professional reputation outweighs the interest in public safety and welfare. Further, this decision fails to acknowledge other potential consequences. For example, a hospital's failure to report suspensions as legally-required can result in loss of HCQIA immunity. 42 U.S.C. §§ 11111(b), 11133(c); 45 C.F.R. § 60.9(c); *Babcock v. St. Francis Med. Ctr.*, 543 N.W.2d 749, 755-56 (Neb. App. 1996) (recognizing that both the hospital and the state medical board are subject to sanctions under the HCQIA if they fail to comply with the Act's reporting requirements).

¶62 By concluding that Dr. Doe's interests are not being elevated over those of the public, the Court states that "there was no evidence presented that Dr. Doe was a danger to patients or staff at any hospital in which he is privileged to practice." Opinion, ¶ 38. This ignores, however, Dr. Doe's violation of the ethical rules of not treating one's self or family; his ordering of hundreds of laboratory tests and a large number of imaging studies on himself, his wife, and his two minor children; his refusal to provide any information to the CMC medical staff about the tests and studies he ordered; his inconsistent and contradictory statements to the CMC medical staff regarding the tests; and his refusal to undergo a psychiatric evaluation by a provider designated by the CMC Medical Executive Committee. Also ignored is the opinion of 16 peer physicians at CMC who unanimously voted to suspend Dr. Doe's hospital privileges for concerns related to his exercise of poor medical judgment. Further evidence of Dr. Doe's medical competence was foreclosed by Dr. Doe's failure to provide information to those supervising him. The unanimous opinion of the 16-member medical panel about Dr. Doe could well be legitimate.

¶63 I would reverse the injunction.

/S/ JIM RICE